# ANDREA N. MINYARD, M.D.
## FORENSIC PATHOLOGIST

Mailing Address:
P.O. Box 10981
Pensacola, Florida 32524-0981

Physical Address:
5151 North Ninth Avenue
Pensacola, Florida 32504
Cell Phone: 850-393-4004

November 2, 2009

Shane M. Dean
Bozeman, Jenkins & Matthews
PO Box 13105
Pensacola, FL 32591

Dear Mr. Dean:

You asked that I review the case of Jermylin D. Murphy, age 8 months, for the purpose of offering an opinion, within a reasonable degree of medical certainty, as to cause and manner of death. Please refer to the attached curriculum vitae for a listing of my qualifications and publications. Compensation will be billed at the rate of $400 per hour. The following is a list of other cases, within the preceding four years, in which I have been retained as an expert for the purposes of litigation. This list does not include cases in which I have served as main prosector at autopsy:

    July 2008—Newsome et al vs. Video Warehouse, Inc. et al.

    January 2009—Jermale Murphy, SR. and Megan Whitney, as Special Administrators of the Estate of Jermylin Murphy, deceased v. Fisher-Price, Inc. and Target Corp.

    October 2009—Jeffrey G. Cunningham, as surviving spouse and as Personal Representative of the Estate of Joy Cherie Cunningham, Plaintiffs, vs. Robert A. Althar, MD, FACS, Efiong O. Andem, MD, Anwar Chowdhury, PA, Individually, and DFS Walk-In Clinic, Defendants.

Regarding the death of Jermylin D. Murphy, I reviewed the pre-terminal circumstances, the autopsy findings (from the autopsy protocol and photographs), the clinical history, and the "scene investigation," or in this case, an examination of a swing similar to the one in which

1



Jermylin was found unresponsive. For a complete listing of materials reviewed, please refer to "Index."

**Circumstances surrounding the death of Jermylin D. Murphy:**

On January 2, 2008, Decatur Police Department responded to an emergency call made by Jermale D. Murphy Sr. regarding his 8 month old son, Jermylin. Jermale frantically told the 911 dispatcher that his son had suffocated in the swing in which he had been sleeping.

Megan D. Whitney, Jermylin's mother, stated she fed him a bottle at 1:30 am and placed him back to sleep in his swing, a Portable Rainforest Take Along Swing Model number K7203. Later that same morning at approximately 8:30 am, she discovered him unresponsive, still belted into the seat of his swing. The seat pad's upper pocket, which was normally cupped over the seat back tube, had turned inside out and become detached, subsequently covering Jermylin's head. His face had a mottled, cyanotic appearance and a linear mark, as noted by his parents and the medical responders. Jermylin was asystolic when emergency responders arrived, and he never regained a pulse or blood pressure. Despite having signs of obvious death, he was taken to Decatur Memorial Hospital at 8:52 am where emergency resuscitation continued to no avail. His rectal temperature on arrival was 96.9*F. He was pronounced deceased at 9:06 am. An autopsy was performed the following day at the Memorial Medical Center, where the cause and manner of death were ruled "most consistent with SIDS" and "natural."

> *Explanatory note:* Sudden Infant Death Syndrome (SIDS) is a medical diagnosis which is poorly understood but commonly used as a cause of death in infants below the age of 12 months. SIDS is defined as the sudden death of a normal, healthy infant which remains unexplained after a thorough case investigation, including performance of a complete autopsy, examination of the death scene, and review of the clinical history. While several autopsy findings, such as intrathoracic petechiae and perioral blood tinged fluid, may be seen with some regularity, none of these findings are pathognomonic of SIDS. SIDS is a diagnosis that cannot be made on autopsy findings alone. Usage of the term SIDS requires the exclusion of any other possible cause of death, making it a "diagnosis of exclusion."

**Review of Clinical History, Autopsy Report, and Autopsy Photographs:**

Jermylin D. Murphy was delivered vaginally at 32 weeks gestation secondary to early onset of labor. Pediatric records are significant for oral thrush, diaper rash, and bilateral testicular hydroceles. Despite being born prematurely, Jermylin had normal growth and development. At age 8 months, using autopsy measurements, he was well within the normal ranges for body weight, height, head circumference, and organ weights for children his age. Observations at autopsy include intrathoracic petechial hemorrhages and an absence of trauma or natural disease processes. Jermylin had fixed livor mortis posteriorly and in the lower portion of the face, the pattern of which would be "compatible with the infant having had his head against a bar of a swing with the lower portion of face [sic] in a dependent position."

> *Explanatory note:* Livor mortis is a postmortem change; it is defined as the settling of blood in the dependent areas of the body after death. It begins to develop immediately after death but may not be visible for several minutes. It intensifies with time until

becoming fully developed around 10 hours. Firm pressure against the skin may result in permanent blanching of the livor mortis in that area. Once formed, livor mortis may change positions depending on the position of the decedent; during this time period, livor mortis is referred to as "unfixed." Several hours after death, livor mortis becomes "fixed," which means its position will no longer change when the decedent is turned over or otherwise placed in a different position.

Pictures taken at autopsy (JM00798-JM00831 and JM00088-JM00090) show an adequately nourished and hydrated, fair skinned, biracial male infant with brown hair. Initial photographs depict the child in a hospital gown with medical therapy. Later pictures show various surfaces of the child without medical therapy or clothing and, lastly, the internal examination, with pictures of the undersurfaces of the scalp, the brain, the base of the skull, the heart, the trachea, and the stomach with esophagus. Livor mortis is in the face, most prominent in the inferior or lower aspect (JM00802). Also seen is the postmortem linear blanched mark of the right forehead which extends from the level of the right lateral eyebrow to the hairline at the top of the forehead; the mark has a mild right to left deviation as it moves upward (JM00798, JM00799, JM00802, JM00809). The folds of the neck (JM00804, JM00810, JM00813) have overlapping linear, mostly horizontally oriented, blanched markings, consistent with the head being down with chin to chest contact during the formation of livor mortis after death. The pattern on the back has several blanched horizontally oriented lines, consistent with pressure marks caused by uneven fabric folds (JM00814). The pictures reveal a very slight swelling of the chest and upper abdomen with an abrupt line of demarcation at the level of the waist, below which does not appear swollen (JM00806, JM00808, JM00814). The right side of the waist has a prominent patterned band-like indentation (JM00808) consistent with the position of the waist belt of the swing. The pattern of livor mortis on the back also changes abruptly at the waistline, being prominent above and absent below; the line of demarcation has a "V" shape with the center of the "V" pointing downward toward the central cleft of the buttocks. The lower extremities and buttocks are pale without apparent livor mortis (JM00801, JM00808, JM00811, JM00814).

**Examination of the swing:**

One of the most important aspects of an infant death investigation is examination of the scene, or in this case, the swing. Accidental asphyxia has been commonly misdiagnosed as SIDS, because autopsy findings alone will not differentiate the two. Both SIDS and asphyxial deaths may occur in the absence of any anatomical abnormalities; or both may have non-specific findings such as intrathoracic petechiae and perioral blood tinged fluid. The diagnosis of asphyxia can only be made with a thorough scene investigation including an examination of the periterminal environment of the infant.

> *Explanatory note:* Asphyxia is defined as the lack of oxygen in the blood and the failure of the body to eliminate carbon dioxide. The diagnosis of asphyxia may lie entirely in the scene investigation. Positional asphyxia is a type of asphyxia produced when an individual assumes a terminal physical position which is incompatible with breathing, or ventilation of the lungs, which causes a lack of oxygen and a build-up of carbon dioxide in the blood leading to death.

A crude examination of a swing similar to the one in which Jermylin was found unresponsive, confirms the tendency of the seat back tube to collapse when mild downward pressure is applied

3

to the seat pad's bottom. The seat back tube moves forward and downward such that the seat back tube and the seat bottom tube rest against each other, and the seat pad folds in half. With further manipulation and downward pressure on the seat pad, the pad upper pocket detaches from the seat back tube by turning inside out, thereby exposing the seat back tube.

**Opinions:**

The following list of autopsy findings and my own observations from review of the autopsy photographs support what I believe was Jermylin's final position in the collapsed seat pad of his swing at the time he was discovered by his mother:

1. Fixed livor mortis on the lower half of the anterior face, an autopsy finding, suggests that the face was tilted downwards.

2. The linear postmortem indentation of the right side of his forehead and the faint livor mortis surrounding it, an autopsy finding, suggests the forehead was resting against a firm linear object such as the seat back tube. This would confirm the displacement of the seat back tube forward and downward and detachment of the seat pad's upper pocket from the seat back tube.

3. Livor mortis of the anterior neck with blanched horizontal lines, my observation from photographs, suggests the child died with his chin near or touching his chest, resulting in blanching of the livor mortis around the neck folds.

4. The absence of livor mortis and the pallor of the skin of the lower extremities, my observation from photographs, suggest the feet were up in the air above the level of the chest, disrupting the normal flow of blood to the legs and preventing the settling of blood in the back of the legs after death.

5. Livor mortis on the back is clearly demarcated from its absence on the buttocks and lower extremities with a "V" shaped line at the waist. The right side of the waist has a band-like patterned linear indentation consistent with the position of the waist belt. These (my) observations from photographs suggest he was tightly bound around the waist by the belt of the seat pad after its displacement and collapse between the swing's seat back and seat bottom tubes.

6. The barely noticeable swelling of the abdomen in comparison to the buttocks, my observation from photographs, suggests the child's waist was tightly bound by the belt as a result of the seat's collapse. The pressure from the belt would have disrupted normal blood flow to the lower part of his body; this combined with the upward displacement of the lower extremities above the chest would explain the mild swelling.

**Summary:**

In the early morning hours of January 2, 2008, Jermylin Murphy became wedged in his Rain Forest Swing. The seat pad of the swing, under Jermylin's weight, collapsed bottom-first between the seat back and seat bottom tubes following the collapse of the swing's seat back tube forward and downward. Jermylin was bent in half at the torso with his chin pressing downward, his face tilting downward against the seat back tube, and his legs and feet jutting upward.

4

Unable to exit the swing due to being belted, he likely struggled to free himself resulting in further movement of the seat pad. The struggle most likely caused detachment of the seat pad's upper pocket from the seat back tube, as reported by both parents. Jermylin's awkward position within the seat resulted in a tightening of the belt around his waist, resulting in the abrupt line of demarcation of livor mortis and the mild swelling of the upper torso. His terminal physical position within the seat was incompatible with adequate ventilation of the lungs and severely compromised his ability to breathe, resulting in asphyxia most likely within minutes of the seat pad's collapse.

In the case of Jermylin Murphy, my conclusion is that the cause of death is positional asphyxia, and the manner of death is accident. Description of how injury occurred is "wedged in collapsed swing seat." My opinions are within a reasonable degree of medical certainty.

If I may be of further assistance, please do not hesitate to call.

Sincerely,

Andrea N. Minyard, M.D.
Forensic Pathologist